**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**MONIQUE PEÑA, Individually and
As Personal Representative of the Wrongful
Death Estate of Matthew Peña, Deceased,**

      **Plaintiff,**

**v.**                                                                **CIV. No. 22-516 MIS-KK**

**BOARD OF COUNTY COMMISSIONERS FOR THE
COUNTY OF CIBOLA, CORECIVIC, and WARDEN
LUIS ROSA, JR., MIKIELE MONANTO,  JORDAN
CASAMERO,  BENNIE MARIA, JR, LAVERA JAMES,
ALONZO ROMERO, JENS REUHRUP, RUBIN
SAAVEDRA,**

      **Defendants.**

**PLAINTIFF'S SECOND AMENDED COMPLAINT FOR NEGLIGENCE, CIVIL
RIGHTS VIOLATIONS, NEGLIGENT HIRING, TRAINING, SUPERVISION AND
<u>RETENTION, SPOLIATION, AND PUNITIVE DAMAGES</u>**

      COMES NOW, Plaintiff Monique Peña, individually and as Personal Representative of the

Wrongful Death Estate of Matthew Peña, deceased, by and through her attorneys of record, Bridget

Hazen (Weems Hazen Law, LLC), and Nicholas T. Davis (Davis Law New Mexico), and brings

this Complaint for civil rights violations pursuant to the Fourteenth Amendment of the Constitution

of the United States 42 U.S.C. § 1983, and the New Mexico Tort Claims Act, NMSA 1978, §§ 41-

4-1 to -27 (1976, as amended through 2020). As grounds for this Complaint, Plaintiff states as

follows:

**PARTIES**

1.    Plaintiff is a resident of Cibola County, New Mexico.

1

2. Plaintiff is court-appointed Personal Representative of the Wrongful Death Estate of Matthew Peña, deceased and was the mother of Matthew Peña during his lifetime.

3. At all times material hereto, Matthew Peña was a resident of New Mexico, being held in Cibola County, New Mexico.

4. At all times pertinent to this Complaint, Matthew Peña was in and under the direct and continuous custody, control, and supervision of Defendants.

5. Cibola County Correctional Center is a detention center located in Cibola County, New Mexico.

### DEFENDANT BOARD OF COUNTY COMMISSIONERS OF CIBOLA COUNTY

6. Defendant Board of County Commissioners for the County of Cibola (hereinafter, referred to as 'Cibola County" or County") is a local government entity organized and existing under the law of the State of New Mexico and is a "person" subject to suit herein. By state statute, the powers of Cibola County as a body politic and corporate are exercised by the Board. The County governs Cibola County Correctional Center, while independent contractors carry out discrete duties at the direction of the County. The County is responsible for the policies, customs and practices at the Cibola County Correctional Center. The County assumes the risks incidental to the maintenance of the Correctional Center, and the employment of its law enforcement officers.

7. At all times pertinent hereto, Defendant County acted through its owners, officers, directors, employees, agents or apparent agents, including but not limited to administrators, management, and other staff/personnel and are responsible for their acts or omissions.

8. Defendant Cibola County operated and/or contracted with others, including Defendant CoreCivic, to operate the Cibola County Correctional Center in the State of New Mexico

2

at all relevant times.

9. At all material times, Defendant Cibola County was responsible for the policies, practices and customs of the Correctional Center.

10. Defendant Cibola County was responsible for the safekeeping of detainees and ensuring that others did not violate the constitutionally protected rights of detainees while they were entrusted to Cibola County or contractors, and agents, to include Defendant CoreCivic.

11. Defendant Cibola County was responsible for ensuring that Cibola County and its contractors complied with federal and state laws.

12. Defendant Cibola County is also responsible for the hiring, screening, training, retention, supervision and discipline, counseling and control of the employees of the detention center, including employees named as defendants herein.

### DEFENDANT CORECIVIC

13. Upon information and belief, Defendant CoreCivic operated the Cibola County Correctional Center at all relevant times.

14. By virtue of a contractual relationship with Cibola County to provide penological services, such as custody and supervision to detainees housed there, CoreCivic is a state actor and may be sued for constitutional violations pursuant to 42 U.S.C § 1983. *See Smith v. Cochran*, 339 F.3d 1205, 1215-16 (10th Cir. 2003) ("[P]ersons to whom the state delegates its penological functions, which include the custody and supervision of

prisoners, can be held liable for violations of the Eighth Amendment."); *see also Phillips v. Tiona*, 508 Fed. Appx. 737, 750 (10th Cir. 2013) ("We have long assumed that employees of a private prison act under color of state law for purposes of § 1983 suits by detainees"); *Tavasci v. Cambron*, No. CIV 16-0461 JB/LF, 2017 U.S. Dist. LEXIS 82649, at *72 (D.N.M. May 31, 2017) (holding that private corporation managing a correctional facility under contract with the State of New Mexico are "persons" subject to suit under § 1983). The federal constitutional claims are brought against CoreCivic in its individual capacity.

15. Upon information and belief, Defendant CoreCivic is a publicly traded corporation incorporated in the State of Maryland and doing business in the state of New Mexico as more particularly described herein.

### INDIVIDUAL DEFENDANTS

16. Defendant Luis Rosa, Jr. was the Warden during all time material and a full-time employee of CoreCivic and, upon information and belief, is a resident of Tallahatchie County, Mississippi.

17. Defendant Jordan Casamero is a resident of Bernalillo County, New Mexico and was a detention officer and employed by CoreCivic during all material times and was acting in the course and scope of his employment.

18. Upon information and belief, Defendant Mikiele Montano is a resident of Cibola County, New Mexico and was a detention officer and employed by CoreCivic during all material times and was acting in the course and scope of her employment.

19. Defendant Bennie Maria, Jr. was a detention officer and employed by CoreCivic during all material times and was acting in the course and scope of his employment and, upon information and belief, is a resident of Bernalillo County, New Mexico.

20. Defendant James Lavera was a detention officer and employed by CoreCivic during all material times and was acting in the course and scope of his employment and, upon information and belief, is a resident of Cibola County, New Mexico.

21. Defendant Alonzo Romero was a detention officer and employed by CoreCivic during all material times and was acting in the course and scope of his employment and, upon information and belief, is a resident of Cibola County, New Mexico.

22. Defendant Jens Reuhrup is a resident of Losco County, Michigan and was a nurse employed by CoreCivic during all material times and was acting in the course and scope of his employment.

23. Defendant Dr. Rubin Saavedra was the Chief Medical Officer, employed by CoreCivic during all material times at CCCC, and was acting in the course and scope of his employment, and, upon information and belief, a resident of Clark County, Nevada.

24. Immunity is waived for the actions described herein under NMSA 1978, Sections 41-4-1 to -27 (1976, as amended through 2020), including Sections 41-4-6 (operation of a building) and 41-4-12 (deprivation of rights under state and federal constitution).

25. A Notice of Claim was delivered pursuant to NMSA 1978, Section 41-4-16 (1977).

**JURISDICTION AND VENUE**

26. This Court has jurisdiction over the parties and subject matter pursuant to federal question jurisdiction, 28 U.S.C. §1331 over the claims that arise under the Constitution and federal laws of the United States. The Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367.

27. Venue is proper with this Court under 28 U.S.C. § 1391 as the Defendant Board of County Commissioners for Cibola County is in, and all of the actions complained of herein occurred in, this district.

## FACTUAL BACKGROUND

28. On January 14, 2021, Matthew Peña admitted himself into the Turquoise Lodge Hospital for drug detoxification.

29. Upon admittance, Matthew Peña reported withdrawal symptoms of anxiety, restlessness, tremors, coldness/shivers, body aches and cold sweats.

30. Based on an assessment of his reported usage and withdrawal symptoms, Matthew Peña was assessed by the staff at Turquoise Lodge Hospital to be an ASAM level 2; requiring partial hospitalization and intensive outpatient treatment for detoxification and rehabilitation.

31. Matthew Peña withdrew himself from Turquoise Lodge Hospital on January 14, 2021, into the care and custody of his family against medical advice.

32. On January 23, 2021, the Grants Police Department was contacted by members of Matthew Peña's family out of concern for Matthew Peña's behavior connected to his drug addiction disorder.

33. Matthew Peña was taken by police to the Cibola County Correctional Center late on January 23, 2021, and booked into the facility that evening, or early in the morning on January 24, 2021.

34. An initial screening was performed by Defendant Montano to determine Matthew Peña's custody classification level and required degree of supervision and management.

35. In addition to the security screening, a cursory medical screening was conducted by

Defendant Reuhrup.

36. At the time of his medical screening, Matthew Peña unequivocally described having a substance abuse disorder including:

    a. He was under the influence of fentanyl at the time of his screening;

    b. He used 60mg of fentanyl per day;

    c. He had been using fentanyl daily for more than a year.

37. Substance abuse disorder is a known public health issue and is particularly prevalent in correctional institutions.

38. Substance abuse disorder is known to be associated with, or a cause of, other mental health disorders including suicide.

39. Matthew Peña was placed in isolation for at least sixty hours by the jail.

40. Matthew Peña was experiencing the severe effects of withdrawal during the sixty hours he was in isolation.[1]

41. Matthew Peña was not convicted of any crime during the sixty hours he was held in isolation.[2]

42. The cell Matthew Peña was held in during this period of isolation included multiple anchor points to hang materials from and fabric bed sheets.

43. On or about January 26, 2021, Matthew Peña, while isolated in his cell, and experiencing the severe effects of withdrawal, committed suicide by hanging.

---

[1] Raffaella Calati, Chiara Ferrari, Marie Brittner, Osmano Oasi, Emilie Olié, André F Carvalho, & Philippe Courtet, *Suicidal Thoughts and Behaviors and Social Isolation: A Narrative Review of the Literature*, J Affect Disord., Feb. 2019.

[2] Suicide was the leading cause of death among jail inmates in 2019. U.S. Dep't of Just., Bureau of Just. Stat., NCJ 301368, Mortality in Local Jails, 2009-2019 - Statistical Tables (2021). Almost 77% of individuals who died in jail in 2019 were not convicted of a crime at their time of death; the mortality rate was higher for unconvicted inmates than convicted inmates. *Id.* In 2019, "suicide was the only cause of death for which incarcerated persons . . . had higher mortality rates than the adjusted U.S. resident population. *Id.*

## ALLEGATIONS COMMON TO ALL COUNTS

### PRELIMINARY ALLEGATIONS

44.    Plaintiff's claims arise from the wrongful death of Matthew Peña while under the care and custody of the defendants at Cibola County Correctional Facility in Milan, New Mexico on or about January 26, 2021.

45.    Despite the chronic understaffing and a pandemic, CoreCivic made profits of $1.91 Billion Dollars in 2020 and $1.86 Billion Dollars in 2021.

46.    At all material times hereto, the individually named defendants were employees and/or agents of Cibola County Correctional Center and/or CoreCivic and were acting within the course and scope of their employment and/or agency.

47.    Negligent conduct of individually named defendants is imputed to Cibola County Correctional Center and CoreCivic as a matter of law.

### QUARANTINE, RESTRICTIVE HOUSING, OR SOLITARY CONFINEMENT CREATE FORESEEABLE MENTAL HEALTH CONCERNS FOR INMATES

48.    In January of 2021, a second surge of COVID was making its way through the United States.

49.    As such, Cibola County Correctional Facility maintained a "quarantine" unit for all incoming inmates into the facility.

50.    Any inmate assigned to general population had to first spend fourteen (14) days in quarantine.

51.    Inmates were individually celled during this time.

52.    Inmates in quarantine were only let out 15-30 minutes in a day, Monday through Friday and not at all on Saturday or Sunday.

53.    In those 15-30 minutes, inmates had to decide between showering, phone calls, any movement they may desire in the day room, and filing any paperwork, including the

paper requests for medical or mental health.

54. Inmates in quarantine were not permitted to be out at the same time as any other inmates.

55. Inmates in quarantine were thus not permitted to socialize or interact with anyone unless it was through a cell door.

56. Inmates were restricted in their movements.

57. If an inmate in quarantine required medical care, security would need to first clear every entrance and hallway to and from the pod and unit before transporting that inmate.

58. CoreCivic orders mandated that all staff, including security, limit their movement to reduce the costs of disposable personal protection equipment.

59. The only differences between quarantine and restrictive housing were that restrictive housing required an inmate be handcuffed to be moved, that it was called restrictive housing, and that restrictive housing policies and procedures required that *more* officers be posted in those units.

60. At relevant times in the quarantine unit, a single officer would be responsible for an entire unit, which is comprised of five (5) pods with forty-eight (48) cells in each pod (potentially two hundred forty (240) inmates house in two hundred forty (240) different cells).

61. It is commonly known, including among correction facilities, that placing a person alone in a cell for 22-24 hours a day with little human contact or interaction is solitary confinement, according to the United Nations.[3]

---

[3] "International treaty bodies and human rights experts, including the Human Rights Committee, the Committee against Torture, and the U.N. Special Rapporteur on Torture, have concluded that solitary confinement may amount to cruel, inhuman, or degrading treatment in violation of the International Covenant on Civil and Political Rights and the Convention against Torture and other Cruel, Inhuman, and Degrading Treatment or Punishment." Jeffrey L. Metzner, MD, & Jamie Fellner, Esq., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psychiatry Law 104, 104-08 (2010) (citations omitted).

62. Solitary confinement is correlated to an increase likelihood of suicide.[4]

63. Matthew Peña was housed in a single-occupancy cell in the quarantine unit in the early hours of Sunday, January 24, 2021 until his death on Tuesday, January 26, 2021.

64. It is unknown whether the call button in Matthew Peña's cell was operational during his time in the cell.

65. Over the course of the two and a half days Matthew Peña was alive in the quarantine pod, he was out his cell (but still with very limited contact) for as little as 30 minutes, and at most an hour and a half, leaving Matthew Peña isolated in a solitary cell for approximately 60 hours.

66. Defendants do not have documentation of, and it can reasonably be inferred were not monitoring, how much time Matthew Peña was out of his confinement.

### SUICIDE IS A FORESEEABLE RISK FOR CORRECTIONS FACILITIES

67. Suicide is a serious concern for detention center detainees.

68. Suicide was the leading cause of death among jail inmates in 2019.[5]

69. Cibola County Correctional Center and CoreCivic had policies and post orders in place and conducted training(s) on, suicide, including both initial evaluation and on-going observation identifying the several factors that play into a detainee being or becoming suicidal, as well as handling inmates who have expressed a suicidal intent.

### MATTHEW PEÑA'S SUICIDE WAS FORESEEABLE TO DEFENDANTS CORECIVIC, CIBOLA COUNTY AND INDIVIDUAL DEFENDANTS.

70. Substance abuse disorder is a medical and mental health concern, as it can both lead to

---

[4] The effects of solitary confinement on mental health can be lethal. Even though people in solitary confinement comprise only 6% to 8% of the total prison population, they account for approximately half of those who die by suicide. Tiana Herring, *The Research is Clear: Solitary Confinement Causes Long-Lasting Harm*, Prison Policy Initiative (December 8, 2020) https://www.prisonpolicy.org/blog/2020/12/08/solitary_symposium/ (citations omitted).

[5] Mortality in Local Jails, 2009-2019 - Statistical Tables.

10

an overdose and be a contributing factor to mental health issues, including suicide risk.

71.   Researchers have found causal links between isolation and suicidal ideation and behaviors.[6]

72.   Specifically, social isolation is one of the main risks associated with suicidal outcomes.[7]

73.   Upon information and belief, Matthew Peña exhibited signs of distress to corrections officers and a nearby inmate while experiencing the severe effects of withdrawal.

### CORECIVIC EMPLOYEES' DELIBERATE INDIFFERENCE, CULPABLE STATE OF MIND, UNFITNESS

74.   Defendant Reuhrup had a duty to use his medical knowledge to accurately assess, and document, all the concerns in regard to the Matthew Peña.

75.   Defendant Reuhrup did not accurately assess and document all the concerns in regard to Matthew Peña.

76.   Despite this concern, Matthew Peña's substance use, currently being under the influence, and eminent withdrawal was information that Defendant Reuhrup did not convey to Defendant Montano.

77.   Defendants Casamero, Maria Jr., Romero and Lavera were all detention officers assigned to work shifts in the unit in which Matthew Peña was housed while detained at Cibola County Correctional Center.

78.   Upon information and belief, Defendants Casamero, Maria Jr, Romero and Lavera were not informed by Defendant Reuhrup or Defendant Montaño, or any other officer, that Matthew Peña was suffering from drug addiction or was likely to be experiencing withdrawal symptoms while in the quarantine unit.

---

[6] Calati, *supra* note 1.

[7] *Id.*

11

79. Upon information and belief, Defendants Casamero, Maria Jr., Romero and Lavera observed signs of distress from Matthew Peña, including but not limited to verbal requests for help.

80. Defendant Casamero had a practice of routinely failing to speak with the inmates when he assessed their well-being and rather just looked briefly into the cells to see if they were moving or breathing.

81. Defendant Casamero was not told that Matthew Peña suffered from drug addiction.

82. Defendant Casamero was not told Matthew Peña was actively in withdrawal from fentanyl.

83. Despite not knowing this, Defendant Casamero observed that something was not right with Matthew Peña and that he appeared distressed.

84. Defendant Casamero observed Matthew Peña pacing in his cell, sweating, and at times appearing despondent.

85. Defendant Casamero identified Matthew Peña's behavior and presentation as being consistent with substance withdrawal, according to his training.

86. Defendant Casamero believed Matthew Peña was detoxing.

87. Upon information and belief, the other defendant officers, Maria Jr., Romero and Lavera, either observed these symptoms and behaviors or failed to adequately monitor Matthew Peña such that they could not observe the obvious symptoms and behaviors, identified in their policies, as symptomatic of suicide-risk.

88. Contrary to policy and the substance withdrawal trainings officers like Defendant Casamero participated in, none of the defendant detention officers conveyed any of their observations or concerns to either the medical or mental health staff.

89. Contrary to policy and the substance withdrawal trainings, officers like Defendants

12

Casamero participated in, none of the defendant detention officers conveyed any of their observations or concerns to a supervising officer.

90. Given Matthew Peña's report of being under the influence and his reported level of daily usage, Matthew Peña should either have been classified as high-risk and placed into housing where he could receive medical observation when he would inevitably begin the suffer the effects of withdrawal.

91. Despite the trainings, policies and post-orders in place that on their face sought to identify suicide factors, other than when an inmate affirmatively expressed suicidal ideations, or attempted a suicide, the implementation of the policies blocked the ability for those factors to lead to any meaningful intervention.

92. Regardless of covid-based housing restrictions, at a minimum, information regarding Matthew Peña's inevitable withdrawal should have been passed along in a manner such that if that risk factor, along with others, was identified, help could have been sought for Matthew Peña.

93. Instead, Matthew Peña was classified for General Population and placed into a 14-day restrictive quarantine pursuant to covid precautions.

94. No information about his substance use, currently being under the influence and pending withdrawal was conveyed to the officers overseeing Matthew Peña.

95. Defendant Casamero found Matthew Peña in his cell, hanged.

96. When Defendant Casamero found Matthew Peña's body, it had been nearly an hour and a half since he last conducted his rounds in the pod.

97. On January 24th, Defendant Casamero worked twelve (12) hours straight on a "constant watch" shift, followed by four (4) more hours working security in a pod until 10:00pm.

98. Defendant Casamero then went back on shift at 6:00am the next day, January 25th, to

work another twelve (12) hours shift.

99. Upon information and belief, Defendant Casamero worked the entire January 25th shift alone in the quarantine unit, having to complete the duties of both the Rover and Unit Control officers.

100. On January 26, the day Matthew Peña hanged himself, Defendant Casamero again went on shift at 6:00am to work in the quarantine unit assigned as the Control Officer.

101. Upon information and belief, Defendant Maria Jr., the assigned roving officer did not perform any rounds on January 26th and did not complete an incident report following the hanging of Matthew Peña.

102. Based on documentation provided by the Defendant, in the thirty-six (36) hours prior to his death:

    a. Matthew Peña rarely, if ever, saw the two individuals whose job it was to monitor his health -- Defendant Casamero and Defendant Maria Jr;

    b. Matthew Peña was experiencing the worst of his expected withdrawal symptoms; and,

    c. Matthew Peña's call button, if he knew how and when to use it, was not being monitored by Defendant Casamero, the assigned control officer on January 25th and January 26th.

103. Shortly after this incident, Defendant Casamero was terminated for falling asleep on the job while on constant watch duty.

### CORECIVIC'S POLICIES AND PRACTICES CAUSED MATTHEW PEÑA'S SUICIDE

104. At the time Matthew Peña hanged himself, he had been subject to or was experiencing several of the signs and symptoms of vulnerability-to-suicide listed in Cibola County Correctional Center's policies, post orders and training materials.

105. At the time of Matthew Peña's death, Cibola County Correctional Center's had policies and practices including having security officers:

   a. Work shifts in excess of 12 hours;

   b. Work shifts with little time for rest between shifts;

   c. Maintain COVID specific practices without additional resources or assistance;

   d. Be responsible for multiple roles, often with mutually exclusive duties, at the same time;

   e. Limit the use of Personal Protective Equipment to cut costs;

106. Undoubtedly impacted by the policies and practices, there is no indication that any of the individually named detention officer defendants reported any of Matthew Peña's signs and symptoms as required by their training, policies and post orders.

107. The failures by the overtaxed and under resourced employees was a result of a corporate culture of greed geared to incur the lease possible costs to run the facility so as to maintain the highest profit.

108. At all times material hereto, Cibola County Correctional Center and CoreCivic had a policy and practice of cutting costs by understaffing and providing inadequate training to its correctional officers.

109. At all times material hereto, Cibola County Correction Center was understaffed and among the CoreCivic facilities was particularly difficult to staff with local detention officers.

110. At all times material hereto, Cibola County Correctional Center and CoreCivic had a policy and practice of inadequately screening, classifying, and monitoring detainees for medical and mental emergencies.

111. At all material times hereto, Cibola County Correctional Facility was operated on an

15

indirect supervision model, meaning:

    a.  In general population pods and units, detention officers were not constantly in the pods.

    b.  Instead, several pods were grouped in a horseshoe fashion into which a Unit Control center could see into each pod.

    c.  A corridor separated the Unit Control from each unit,

    d.  A Unit Control officer visually monitors pods and must look through two sets of security glass to see into any pod;

    e.  As each pod had dozens of cells, the Unit Control officer could only see partially into each day room;

    f.  The same Unit Control officer in charge of looking into pods and individual cells in the Unit Control was also in charge of monitoring the video feeds of each pod;

    g.  There are two video feeds per pod;

    h.  The Unit Control officer in charge of looking into pods and individual cells, as well as monitoring the multiple video feeds, was required at the same time to log the movements of any detention officers, staff or inmates;

    i.  Among the detention officers to be monitored by the Unit Control officer was the designated Rover Officer;

112.    Cibola County Correctional Facility had a custom, policy, or practice of failing to maintain the staffing required for its own indirect supervision model, including having a single officer perform both the role of the Unit Control officer and Rover officer, which is categorically insufficient, if not impossible, because:

    a.  The single officer cannot maintain visual supervision from the unit control, visual monitoring of the video, and monitoring movement of people in the facility if they

16

are "roving;"

b. The single officer cannot maintain regular, close, visual supervision of the individual inmates if they do not leave the unit control;

c. If the officer is outside of the unit control, the officer is unable to maintain supervision of the common spaces and, most importantly, cannot respond to call buttons located in individual cells for inmate safety.

113. Cibola County Correctional Facility has a supervision plan ostensibly designed for inmate safety. Failing to adhere to its own plan compromises inmate safety.

114. The Cibola County Correctional Facility had a practice of understaffing the facility at the time, forcing security staff to work overtime to cover additional posts and shifts.

115. The facility's practice of understaffing was exacerbated by foreseeable covid-related staff absences.

### POLICY MAKERS' CULPABILITY

116. Defendants Rosa and Saavedra were the respective policy makers for security and medical at Cibola County Correctional Center.

117. Defendant CoreCivic, through Rosa and Saavedra, is aware that intake screening, both security and medical, is merely a "snapshot" of the inmate at that time.

118. Defendant CoreCivic, through Rosa and Saavedra, is aware that an inmate's condition will change during their incarceration.

119. As such, the policies, post orders and trainings identify the need for and emphasize that staff should conduct on-going direct observation of inmates.

120. Despite these policies, post orders and trainings, Defendant CoreCivic, through Rose and Saavedra, routinely fail to sufficiently staff the facility in a way that would allow for this level of supervision.

17

121. Substance abuse, particularly the widespread use of fentanyl, was a known concern to Cibola Correctional Center and CoreCivic such that it was included as a part of the suicide risk and contributing factors in its policies, post orders and trainings.

122. Despite having policies about identifying and eliminating the risk of suicide, these policies and post orders siloed the information about any individual inmate such that only overt expressions of suicide and/or actual attempts garnered any kind of response or care from the facility.

123. Despite the suicide policies and the on-going observation directives, Defendants operated, caused to operate or allowed to be operated Cibola County Correctional Facility in a manner such that staff could not, or were hampered in, executing those policies in any meaningful manner.

124. Despite the suicide policies and the on-going observation directives, Defendants Cibola County and CoreCivic through Defendants Rosa and Saavedra failed to have a system, practice or custom to have that information conveyed such that it was actionable to identify, address and prevent suicides other than in a reactive manner to inmates who either conveyed express suicidal ideations or made suicidal attempts.

125. Thus, while suicidal factors and concerns were known to Defendants, the actual implementation of any policies, post orders or trainings, by custom and practice, ignored that known threat.

126. Defendants, individually and collectively, had a duty to accurately assess Matthew Peña's risk level during his initial screening and assigning his housing accordingly.

127. Defendants failed to accurately assess Matthew Peña's risk level during the initial screening and by placing him into the general population instead of into restrictive housing where he could be medically observed for signs of detoxification and withdrawal.

128. Per the policies and procedures in place, that assessment, though a "snapshot" during intake, is intended to be "on-going" and is the responsibility of all staff in contact with any given inmate to monitor throughout their detention.

129. This assessment includes more than what is perceived during a single questioning or determination during an intake procedure.

130. By failing to accurately assess Matthew Peña's risk level and subsequently placing him into the general population instead of into restrictive housing, Defendants created the opportunity, and enhanced the likelihood, for self-harm to occur.

131. Defendants, individually and collectively, were responsible for monitoring Matthew Peña during his incarceration, including his time in his cell, to foresee and eliminate opportunities for self-harm, especially given his physical and mental state.

132. By failing to monitor Matthew Peña, Defendants created the opportunity for self-harm to occur.

133. Defendants, individually and collectively, showed a lack of care for the safety and welfare of Matthew Peña, in derogation of duties owed to him.

134. Defendants showed a wanton disregard for the safety and security of detainees in their custody and care, including Matthew Peña.

135. Defendants CoreCivic and Cibola County had a duty to ensure that Cibola County Correctional Center was appropriately staffed at all times.

136. Defendant Cibola County allowed Defendant CoreCivic to operate its facility, Cibola County Correctional Center, at the bare minimum requirements, to maximize corporate profit and minimize care of its inmates.

**COUNT I: §1983 FAILURE TO TRAIN AND SUPERVISE CAUSING
VIOLATION OF CONSTITUTIONAL RIGHTS**

137. Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

138. Defendants Cibola County and CoreCivic are persons under 42 U.S.C. § 1983 and the acts and omissions of Defendants were conducted within the scope of their official duties and employment and under the color of law.

139. Defendants acted pursuant to policy and custom, with reckless disregard for Matthew Peña's right not to be subjected to serious dangers created by and under the control of the Defendants.

140. Defendants CoreCivic, Cibola County, Warden Rosa and Saavedra had policies, post orders and trainings in place that identified several factors that give rise to concern that an inmate may commit suicide.

141. These policies, post orders and trainings purported to reduce suicide risk, both when overt expression of suicide exists or when concerning factors are identified, that they be conveyed, and measures taken to address inmate suicide.

142. Despite these policies, post orders and trainings, there existed a custom, unwritten policy and/or practice that siloed this information such that while several factors might be present for any given inmate, that information was not shared. To wit, the only suicidal prevention undertaken was for overt expression of either verbal suicidal ideations or suicide attempts.

143. Defendants CoreCivic, Cibola County, Warden Rosa and Saavedra had policies, post orders and trainings in place that identified the several concerns of substance abuse, including opioids and even in particular the increased issues with fentanyl abuse.

144. Despite these policies, post orders and trainings, there existed a custom, unwritten policy and/or practice that only addressed these substance abuse concerns if they presented immediately during the medical screening at intake, or happened to be observed timely, and at a severe enough level, to be conveyed by staff once inmates were admitted.

145. Defendants CoreCivic, Cibola County, Warden Rosa and Saavedra had a policy, practice or custom of understaffing at Cibola County Correctional Center.

146. Defendants CoreCivic, Cibola County, Warden Rosa and Saavedra failed to have policies, post orders and trainings in place that address the particular needs of detainees in an intake pod, particularly with regard to detoxification from substance abuse, in conjunction with their being housed ostensibly in isolation with minimal observation, less than if they were in fact housed in the restrictive housing unit.

147. Matthew Peña was, at all material times, under the care, control and custody of Defendants and Defendants had a non-delegable duty to ensure the safety of all persons under their direct care, control and custody, including Matthew Peña.

148. Defendants knew or should have known that failure to properly staff the facility, including proper hiring, training and supervision, would have life-threatening consequences to the detainees housed there, such as Matthew Peña.

149. Defendants' acts and omissions were pursuant to policy and custom of providing inadequate training to screen, classify and monitor detainees that violated the Constitutional rights of Matthew Peña.

150. Defendants' acts and omissions pursuant to policy and custom indicates Defendants' deliberate indifference to the health and safety of the detainees at Cibola County Correctional Center.

21

151. The actions and omissions of the Defendants as described herein intentionally deprived Matthew Peña of the securities, rights, privileges, liberties, and immunities secured by the Constitution of the United States of America and caused him other damages as set forth with greater particularity herein.

152. Defendants promulgated, created, implemented or possessed responsibility for the continued operation of a policy that caused the complained of constitutional harm, and acted reckless disregard for the rights of Matthew Peña as secured by the Constitution.

153. As a proximate result of the Defendants' acts and omissions as stated with greater specificity herein, Matthew Peña was harmed.

154. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages.

**COUNT II: 1983 FOURTEENTH AMENDMENT**
**VIOLATION OF DUE PROCESS**

155. Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

156. In the Tenth Circuit, a pretrial detainee's due process rights under the Fourteenth Amendment parallel that of an inmate's Eight Amendment rights: "Pretrial detainees are protected under the Due Process Clause rather than the Eighth Amendment . . . In determining whether appellant's rights were violated, however, we apply an analysis identical to that applied in Eighth Amendment cases brought pursuant to § 1983." *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999).

157. Jail officials have a responsibility to take "reasonable measures to ensure the safety of inmates" and detainees. *LeMaster*, 172 F.3d at 763. "In fact, the due process rights of a person in [this] situation are at least as great as the Eighth Amendment protections

22

available to a convicted prisoner." *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).

158. Detention facilities violate the Eight Amendment's prohibition against cruel and unusual punishment if they cause unquestioned and serious deprivations of basic human needs that deprive detainees of the minimal civilized measure of life's necessities. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

159. The government assumes responsibility for satisfying basic human needs such as food, clothing, shelter, medical care, and reasonable safety when it takes a person into custody against his or her will.

160. Matthew Peña had factors or exhibited several of the signs and symptoms identified in the Defendants CoreCivic, Cibola County, Warden Rosa and Saavedra's policies, post orders and trainings to be considered a heightened suicide risk.

161. The culture of Cibola County Correctional Center, through the customs and practices in the facility, either incentivized silence, or through the very nature of the facility being short-staffed, impeded the sharing of concerning information regarding a detainee's medical or mental health needs, and in particular as to Matthew Peña's medical and mental health needs.

162. By and through the actions described above, Defendants violated Matthew Peña's due process rights. In particular, Defendants violated Matthew Peña's right to be afforded a reasonable degree of safety from serious bodily injury and death.

163. Defendant CoreCivic, both on its own and through its officers, administrators, agents and employees, had an official policy, custom, or practice that was deliberately indifferent to Matthew Peña's Fourteenth Amendment rights.

23

164. The acts and omissions of Defendants were the legal and proximate cause of Matthew Peña's wrongful death.

165. Defendant's unconstitutional policies, customs, or practices as described herein were the legal and proximate cause of Matthew Peña's wrongful death.

166. The acts and omissions of Defendants as described herein intentionally deprived Matthew Peña of the securities, rights, privileges, liberties and immunities secured by the Constitution of the United States of America and caused his wrongful death.

167. Defendants Cibola County and CoreCivic are liable for the negligence of their employees, staff, contractors and other agents, including Defendants John/Jane Does.

168. Defendants had the duty to ensure the health and safety of Matthew Peña and such duty is a nondelegable duty.

169. As a result of Defendants' acts and omissions, Plaintiff suffered damages as set forth with greater particularity herein.

170. Defendants had a custom, policy, or practice of knowingly and with deliberate indifference failing to properly screen, classify, and monitor detainees.

171. Defendants acted, pursuant to policy and custom, with reckless disregard for Plaintiff's right not to be subjected to serious dangers created by and under the control of the Defendants.

172. Defendants knew, or should have known, that by failing to properly screen, classify, and monitor detainees, they were placing detainees at a risk of harm, especially detainees with substance abuse or mental health disorders such as Matthew Peña.

173. Nonetheless, with deliberate indifference to Plaintiff's Fourteenth Amendment due process right to be free from cruel and unusual punishment, Defendants allowed for the conditions left Plaintiff vulnerable to harm.

174. The actions of Defendants, while rising to the level of subjective intent, also meet the evolving alternative Objective Reasonableness Standard being adopted by different Federal Circuit Courts for various pretrial detainee claims in the response to the U.S. Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).[8] [9]

175. The Tenth Circuit applied the reasoning in *Kingsley* to the conditions of confinement for a pretrial detainee in *Colbruno v. Kessler*, 928 F.3d 1155 (10th Cir. 2019) "A pretrial detainee can establish a due-process violation by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019) (Citing Kingsley).

176. For Matthew Pena, subjecting him to the actions of the Defendants enumerated herein, and particularly the conditions of confinement, was not rationally related to a legitimate

---

[8] Under **_Kingsley_**, a **pretrial detainee** need not prove the subjective elements about the officer's actual awareness of the level of risk. At the same time, however, mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment. Thus, the test to be applied under **_Kingsley_** must require a **pretrial detainee** who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard. *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 9th Cir. 2016).

[9] The Second, Seventh, and Ninth Circuits have applied *Kingsley* to various claims by pretrial detainees. *See Darnell v. Pineiro*, 849 F.3d 17, 35-36 (2d Cir. 2017) (applying *Kingsley* to a claim involving conditions of **confinement** and indicating that the same objective test for deliberate indifference applies to all claims involving the Fourteenth Amendment's Due Process Clause); *Miranda v. Cty. of Lake*, 900 F.3d 335, 352 (7th Cir. 2018) (applying *Kingsley* to all Fourteenth Amendment claims involving pretrial detainees); *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) (stating that *Kingsley* applies to a pretrial detainee's claims involving deficient medical care). *Quintana v. Santa Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1050 n.7 (10th Cir. 2020).

governmental interest under any circumstances including COVID, and the failures by CoreCivic and its employees were excessive in that his denial of human contact was tantamount to torture.

## COUNT III: NEGLIGENCE

177.     Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

178.     All Defendants herein had a duty of ordinary care to maintain a reasonably safe environment for detainees, complete with adequate security and supervision necessary to prevent foreseeable attempts of self-harm.

179.     Defendants breached that duty by failing to properly screen, classify, and monitor detainees.

180.     Defendant Reuhrup breached that duty by failing to identify or take seriously the regularity of Matthew Peña's opioid usage and the subsequent effects of detoxification he would foreseeably undergo.

181.     Defendants Reuhrup and Montano failed to convey the information known to them regarding Matthew Peña's agitated state throughout the day and leading up to his arrest, along with his addict-level usage of opioids, to anyone at the facility monitoring Matthew Peña.

182.     Defendants Casamero, Romero, Maria Jr. and Lavera failed to timely and attentively monitor, or show up for work to monitor, the Matthew Peña while isolated in his cell.

183.    Defendants Casamero, Romero, Maria and Lavera failed to convey information known or relayed to them regarding Matthew Peña's deteriorating condition that matched information identified as concerning in the policies, post orders and trainings they received.

184.    Defendants acted or failed to act in light of the duty they had to appropriately monitor and care for the inmates in their charge.

185.    As a direct and proximate result of their breach, Matthew Peña, who was a harm to himself, was placed in a harmful situation.

186.    Defendants CoreCivic and Cibola County are liable through *respondeat superior* for the acts or omissions of their agents.

187.    As a direct and proximate result for Defendants' negligence, Plaintiff suffered damages.

## COUNT IV: NEGLIGENT HIRING, TRAINING AND SUPERVISION

188.    Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

189.    Defendants CoreCivic, Cibola County, Rosa and Saavedra were negligent in the hiring, training, supervision and implementation of the same through its policies, post orders and trainings, of Cibola County Correctional Center employees who failed to adequately screen, classify, and monitor detainees.

190.    Defendants' negligence includes all things stated herein but is not limited to:

   a.   Inadequate mental health screenings of detainees upon intake;

   b.   Inadequate drug screenings of detainees upon intake;

   c.   Inadequate classification of detainees based on risk factor(s);

d.  Inadequate means for staff to communicate inmate concerns;

e.  Inadequate staffing; and,

f.  Inadequate monitoring of detainees.

191.  Defendants knew or should have known that the lack of supervision, staffing, experience and training among their employees was likely to harm Cibola County Correctional Center detainees.

192.  The negligence of Defendants directly and proximately caused Matthew Peña's wrongful death.

193.  As a direct and proximate result of the intentional, willful, reckless or negligent acts and omissions of Defendants and their employees and agents, Plaintiff suffered damages.

### COUNT V: NEGLIGENT OPERATION OF A BUILDING

194.  Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

195.  Defendants Cibola County negligently failed to provide, or ensure that Defendant CoreCivic provided, reasonably adequate security to detainees at Cibola County Correctional Center. That failure resulted in a danger to detainees beyond the reasonable and expected risks of prison life.

196.  By committing the acts and omissions described above, Defendants breached their duty to operate and maintain the Cibola County Correctional Center in a manner that prohibits unreasonable or unexpected dangers to detainees.

197.  Defendants' breach of duty was a cause-in-fact and proximate cause of harm to Plaintiff.

198.     Immunity is waived for Defendant Cibola County's negligence under NMSA 1978, Section 41-4-6 (2007).

## COUNT VI: INTENTIONAL SPOLIATION OF EVIDENCE

199.     Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

200.     Cibola County Correctional Facility had two (2) cameras in the pod which housed Matthew Peña and cameras in the intake area where Matthew Peña was evaluated by security and medical to ascertain his ability to be booked into the facility.

201.     Cibola County Correctional Facility had a policy or custom to maintain its digitally stored video footage for approximately ninety (90) days before the storage system "overwrites" the footage.

202.     Upon information and belief, there existed recordings or images of an audio, video, and photographic nature of Matthew Peña during his entire time at Cibola County Correctional Facility.

203.     On February 9, 2021, Plaintiff sent Defendants Cibola County and Core Civic a letter pursuant to the Tort Claims Act requesting that they "preserve all documents, photograph communications, log files, reports, or any other evidence whatsoever related to Mr. Peña from the time of his arrival at the Cibola County Correctional Center."

204.     On February 9, 2021, Plaintiff sent Defendants Cibola County and CoreCivic a letter pursuant to the Freedom of Information Act requesting "any and all records, videos or photographs [they] have regarding Mr. Peña from January 1, 2021 to the present."

205.    On December 19, 2022, Plaintiff sent Defendants Cibola County and CoreCivic its First Set of Interrogatories and Requests for Admission, which contained requests for information pertaining to video surveillance of Matthew Peña and for the video footage itself.

206.    Defendants objected to the requests as unduly burdensome and only provided footage from cameras that they deemed as "likely" to have captured Matthew Peña.

207.    Defendants also cited their video retention policy, which requires that incident-related video be downloaded and stored separately and argued that it would be unduly burdensome for them to retain all footage of Matthew Peña from his two days at the facility.

208.    After receiving notice of Plaintiff's intent to bring a claim, Defendants affirmatively allowed video footage depicting Matthew Peña to be overwritten, thus making it unavailable to Plaintiff. Following Matthew Peña's death there existed a potential lawsuit between Plaintiff and Defendants CoreCivic and Cibola County.

   a.    Defendants had knowledge of a potential lawsuit, including an express directive to preserve all evidence, within two weeks of the incident. Despite knowledge of the potential suit and receipt of the preservation language, Defendants Cibola County and/or CoreCivic intentionally, through act or omission, destroyed, mutilated, or significantly altered potential evidence relevant to this lawsuit.

209.    Defendants Cibola County and/or CoreCivic intentionally, through act or omission, destroyed, mutilated, or significantly altered potential evidence to disrupt or defeat this lawsuit.

210.    The disposal or destruction of evidence has affected Plaintiff's ability to prove her case.

30

211.     As a direct and proximate result of Defendants' spoliation, Plaintiff suffered damages.

212.     Plaintiff adopts and incorporates all other paragraphs of this Complaint for purposes of this claim.

213.     As the direct and proximate result of the breaches and violations by Defendants, Plaintiff suffered damages.

214.     The conduct of Defendants Cibola County and CoreCivic, as well as their employees, were willful, wanton, and in reckless disregard to the rights of the Plaintiff and punitive damages should  be awarded.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

1.  Judgment jointly and severally against all Defendants on all claims;

2.  Monetary damages, including punitive damages, in an amount to be determined at trial;

3.  An award of attorney's fees, costs and expenses in bringing this lawsuit; and,

4.  All other relief that law and justice require.

Respectfully Submitted,

WEEMS HAZEN LAW

*/s/ Bridget Hazen*
Bridget Hazen
Dathan Weems
108 Wellesley Drive SE
Albuquerque, New Mexico 87106
Phone: (505) 247-4700
bridget@weemslaw.com
dathan@weemslaw.com

31

*and*

DAVIS LAW NEW MEXICO

*/s/ Nicholas T. Davis*
Nicholas T. Davis
1000 Lomas Blvd. NW
Albuquerque, New Mexico 87102
Phone: (505) 242-1904
nick@davislawnm.com

*Attorneys for Plaintiff Monique Peña*

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I filed the foregoing pleading electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing. I also hereby certify that on February 23, 2024, the foregoing was sent via email to the following:

Daniel P. Struck
Jacob B. Lee
Michael R. Shumway
Struck Love Bojanowski & Acedo, PLC
3100 West Ray Rd., Ste. 300
Chandler, AZ 85226
Phone: (480) 420-1600
dstruck@strucklove.com
jlee@strucklove.com
mshumway@strucklove.com

Deborah D. Wells
Debra J. Moulton
Kennedy, Moulton & Wells, P.C.
2201 San Pedro NE, Bldg 3, Ste. 200
Albuquerque, NM 87110
Phone: (505) 884-7887
ddwells@kmwpc.com
dmoulton@kmwpc.com

*Counsel for Defendants*

*/s/ Nicholas T. Davis*
Nicholas T. Davis

32